Arthur Glickman v. Commissioner. Herman Glickman and Ruth F. Glickman v. Commissioner. Aaron Glickman and Freda Glickman v. Commissioner.
Glickman v. Commissioner
Docket Nos. 55448, 55452, 55453.
United States Tax Court
T.C. Memo 1957-124; 1957 Tax Ct. Memo LEXIS 142; 16 T.C.M. (CCH) 532; T.C.M. (RIA) 57124; June 28, 1957
Milton Young, Esq., 595 Madison Avenue, New York, N. Y., and Robert Anthoine, Esq., for the petitioners. Martin D. Cohen, Esq., for the respondent. OPPER
Memorandum Findings of Fact and Opinion OPPER, Judge: In these consolidated proceedings respondent determined the following deficiencies in income tax for 1950: Petitioner
Deficiency
Arthur Glickman
$10,343.14
Herman and Ruth Glickman
22,969.08
Aaron and Freda Glickman
10,602.54 The issues involved are whether gain realized by petitioners on (1) a distribution from, and (2) a sale of stock in their corporation is properly taxable as gain on (1) a distribution from, and (2) a sale of stock in a collapsible corporation. Findings of Fact Some facts have been stipulated and are found accordingly. Petitioners Herman and Ruth Glickman, *143 and Aaron and Freda Glickman, husband and wife, respectively, filed joint income tax returns for 1950. Herman and Aaron are brothers. Petitioner Arthur Glickman, son of Aaron and Freda, filed a separate return for 1950. All returns were filed with the collector of internal revenue for the first district of New York. In 1948, Herman sought vacant land suitable for an apartment house. He located an unimproved plot at Mott Avenue between Eggert Place and Dickens Street, Far Rockaway, New York. He could not obtain conventional financing for the construction of an apartment house. After obtaining site approval from the F.H.A., he sought to interest persons with financial stability to act as sponsor in procuring an F.H.A. mortgage commitment. Herman had consulted regularly with Aaron concerning his negotiations with certain investors and other business problems. When the negotiations with those investors failed in 1948, Aaron agreed to sponsor the project on certain conditions. Aaron joined the Mott venture. He thought it would be good for Arthur to gain experience in real estate construction and management. The brothers agreed that Herman should have a 50 per cent and Aaron and Arthur *144 should each have a 25 per cent stock interest in a corporation to be formed to construct the project. They agreed that Arthur would work under Herman's supervision during construction, take charge of renting the apartments, and be in charge of the management after completion of construction. On February 15, 1949, Mott Improvement Corporation, hereafter referred to as Mott, was organized under the laws of the State of New York. On March 3, 1949, Aaron conveyed the Mott Avenue plot consisting of 120,945 square feet to Mott in consideration for the issuance of 8 shares of Mott common stock. Aaron held 2 shares in his own right, 2 shares for Arthur, and 4 shares for Herman. At all material times, only these 8 shares of common stock were issued and outstanding. Mott carried the land on its books at cost, $59,000. At all material times, petitioners were the sole officers and directors of Mott. About December 2, 1948, Mott, as intended mortgagor, and a Brooklyn bank, as intended mortgagee, applied to the F.H.A. for mortgage insurance of $1,056,600, [1] pursuant to section 608 of the National Housing Act, in connection with the proposed construction of a 126-family apartment project, to *145 be known as "Bayswater Gardens." Subsequently the Manhattan Company rather than the Brooklyn bank became mortgagee. On January 31, 1949, the F.H.A. issued a commitment to insure a first mortgage loan to Mott not to exceed $1,066,500. On April 21, 1949, the Manhattan Company agreed to lend Mott $1,066,500 for the construction of Bayswater Gardens secured by a first mortgage on the land and project to be erected thereon. Mott issued to the F.H.A. 100 shares of preferred stock, par value $1.00, on April 21, 1949, for $100 cash received from F.H.A. The preferred stock issue, required for securing mortgage insurance, allowed F.H.A. to take control if Mott breached its certificate of incorporation or F.H.A. rules and regulations. Herman and Arthur incorporated Bayswater Gardens, Inc., hereafter referred to as Bayswater, on August 30, 1948. They served as officers and owned all of the stock. On April 21, 1949, Mott entered into a "Lump Sum" construction contract with Bayswater, pursuant to which Bayswater agreed to erect three apartment buildings for the estimated cost of $1,070,469. Bayswater commenced the project about April 1949. In its fiscal year ended August 31, 1949, it *146 paid $11,400 and $3,800 as salary to Herman and Arthur, respectively. For its fiscal year ended August 31, 1950, it paid $16,800 and $5,600 as salary to Herman and Arthur, respectively. The total costs to Mott for land, construction and incidental construction expenses were as follows: Land
$ 59,000.00
Construction
911,927.64
Incidental expenses (legal
fees, accounting fees, in-
surance premiums, etc.)
40,172.36
Total costs
* $1,011,100.00
Mott received the following mortgage advances from the Manhattan Company: Date
Amount
June 8, 1949
$ 83,763.10
July 5, 1949
209,493.90
Aug. 9, 1949
161,929.80
Aug. 31, 1949
200,838.60
Oct. 3, 1949
132,324.30
Nov. 3, 1949
98,178.65
Dec. 8, 1949
41,602.68
Feb. 8, 1950
31,322.07
Mar. 9, 1950
107,046.90
$1,066,500.00
Early in January 1950, in answer to Herman's inquiry, his accountant reported that if a recognized appraisal showed that improvements made were worth more than cost, Mott could distribute cash to its shareholders. Herman requested that a real estate firm make an immediate appraisal which on January 10, 1950, valued *147 the land and buildings at $1,249,431. The value of the land alone, at $1 per square foot, totaled $120,945. On January 13, 1950, petitioners, as directors of Mott, resolved to write up the property value on the books to $1,243,056, creating a capital surplus in excess of $55,000. They adopted a resolution, pursuant to which Mott distributed that day $55,000 in cash to petitioners as sole stockholders. That amount approximately equaled the amount by which total mortgage advances received and to be received exceeded the construction cost. Petitioners knew that the distribution would be covered by mortgage moneys due under the F.H.A. insured mortgage. The number of shares held by each petitioner, the basis thereof, and the amounts received were as follows: Number
of Shares
Name
of Stock
Basis
Amount
Arthur Glickman
2
$ 500
$13,750
Herman Glickman
4
1,000
27,500
Aaron Glickman
2
500
13,750
Total
$55,000 Petitioners formed the intention to make the distribution about January 1, 1950. Sometime between January and March 1950, petitioners learned that "Wavecrest," a large F.H.A. insured project, was to be built on water frontage 1 to 2 miles *148 from Bayswater Gardens. The features planned indicated that Wavecrest might offer competition to Bayswater Gardens. About May 10, 1950, petitioners contracted to sell their Mott stock to Sam Edelman. About July 10, 1950, Edelman assigned his rights in the contract to Harry Hertz, Henry Hertz, Harry Shafer, Joseph Ajl, Sol Eiger and Harry Rosenfeld for a profit of about $15,000. On August 1, 1950, pursuant to the May 10 contract, petitioners sold their Mott stock. The shares sold and the net proceeds realized by each upon the sale were as follows: Number
Proceeds
Name
of Shares
Received
Arthur Glickman
2
$23,411.70
Herman Glickman
4
46,823.39
Aaron Glickman
2
23,411.70
Total
$93,646.79
The stock acquired from petitioners has been successively sold in a series of transactions. The present Mott shareholders operate the project pursuant to F.H.A. regulations and the terms of the mortgage between Mott and the Manhattan Company. Mott could not liquidate, transfer, or encumber its real or personal property, including rents, without F.H.A. approval. Under regulations under the National Housing Act, the mortgagor had to be a corporation or a trust. *149 F.H.A. did not restrict the sale of Mott common stock, but did require notification of a stock sale or transfer. On August 19, September 20, and October 24, 1949, the City of New York certified that the electric wiring and appliances installed in each of the three buildings of Bayswater Gardens conformed to the city electrical code. About August 10, September 22, and October 20, 1949, the Fire Department approved the installation of fuel oil tanks in each building, and authorized maintenance of oil in the tanks. On August 26, September 26, and October 28, 1949, the Department of Housing and Buildings issued temporary certificates of occupancy without designating completion dates. On November 21, 1949, the latter department issued final certificates of occupancy stating that two units had been completed on October 28 and November 14, 1949, respectively. On December 7, 1949, it issued the final certificate of occupancy for the last unit showing completion on November 14, 1949. The construction superintendent was required to remain on the job until the janitorial superintendent took over. He actually continued on the project through December 7, 1949. The 126 apartments in Bayswater *150 Gardens were occupied as follows: Apartments
Date
Buildings
Occupied
September
1, 1949
1
* 28
October
1, 1949
2
* 58
November
1, 1949
3
* 76
December
1, 1949
3
* 83
January
1, 1950
3
* 90
February
1, 1950
3
** 123
To obtain F.H.A. authority for a building loan advance covering work performed up to November 28, 1949, Bayswater prepared and Herman signed a contractor's requisition. As of November 28, 1949, the following work was stated to be uncompleted: Portion to Be
Completed as of
Description of Work
Nov. 28, 1949
Masonry
1%
Concrete floors and cement work
2%
Stairs
5%
Painting
10%
Weatherstripping and caulking
20%
Plumbing and hot water supply
1%
Row-type garages
5%
Landscape work
50% Landscape work constituted approximately 1 per cent of the total cost. Construction of Bayswater Gardens was finally completed sometime after the middle of January. The contractor's requisition forwarded to the F.H.A. to obtain building loan advances covering work up to January 27, 1950, showed *151 all items completed. This requisition followed an inspection by the F.H.A. resident inspector. No other requisition was made between November 28, 1949 and January 27, 1950. From at least March until May 10, 1950, petitioners held their Mott stock primarily for sale to customers. The demand for real estate made unnecessary a public announcement that the stock was for sale. Herman has been affiliated with real estate investment and the building field for nearly 29 years. In 1946 and 1947, his wholly owned corporation built one-family houses for sale to customers in the ordinary course of trade and business. In 1937 and again in 1941, through a corporation, he built apartment houses. In 1949, a corporation in which Herman owned stock applied for an F.H.A. mortgage commitment for an apartment project. Aaron, in the real estate business for 40 years, advised Herman on real estate matters. He directly or indirectly held interests in a number of pieces of real estate, but had not previously participated in apartment house construction. In 1949, Arthur, 24 years old, had recently left college and had had virtually no experience in the real estate field. Prior to his connection with *152 Mott, he had not participated directly or indirectly as an owner in any real estate venture. He was not a dealer in real estate. Herman owned 75 per cent and Arthur owned 25 per cent of the stock in a corporation that constructed an apartment house in Cedarhurst, Nassau County, New York. They still own their stock in that corporation and Arthur still manages the property. For its taxable year ended January 31, 1950, Mott reported a net operating loss of $1,465.10. At January 31, 1950, it had neither current earnings nor earned surplus. Neither on January 13, 1950, when petitioners received the distribution, nor on August 1, 1950, when they sold their stock, had Mott realized a substantial part of the net income to be derived from Bayswater Gardens. The certificate of incorporation of Mott prevents payment of dividends without the consent of the holders of a majority of each class of stock, including preferred, until the mortgage has been fully paid. Petitioners knew they could receive no dividends prior to 1983. Petitioners received no compensation for services as officers of Mott during the year ended January 31, 1950. Mott was formed or availed of principally for the construction *153 of property with a view to the realization by its shareholders of gain attributable to the property through a distribution to its shareholders, and the sale or exchange of stock by its shareholders, before the realization by Mott of a substantial part of the net income to be derived from such property. Opinion In all material respects this case is indistinguishable from Raymond G. Burge, 28 T.C. - (April 30, 1957). The arguments made on behalf of petitioners that their corporation was not "collapsible" [2] are virtually identical and the facts are strikingly similar. The main difference is a mere matter of detail in that the distribution made in the present case was not accompanied by redemption of any of the corporation's stock. If it is hence contended that it should be governed by section 115(d), as possibly to be distinguished from section 115(i) in the Burge case, that would be a distinction without a difference since there we said: "Whether this transaction should properly be considered as a partial liquidation within the definition contained in 115(i), or whether it should properly be considered as falling within section 115(d) we find it unnecessary to decide since in *154 either case the gain would normally be taxable as a gain from the sale or exchange of property, and if the stock was held for more than six months, would be taxable as long-term capital gain." Here, as in the Burge case, petitioners argue that a cash distribution otherwise taxable under section 115(d) is not an event bringing the definition of section 117(m) into play; that the gain from the distribution *155 was not "attributable to * * * [the constructed] property"; that in any event less than 70 per cent of the gain was so attributable; and that since ultimately the corporation was sold and was continued in existence by the new owners, it is not a collapsible corporation. All of these contentions were disposed of in the Burge case contrary to petitioners' position. As to the distribution being attributable to the property, we think the conclusion inescapable. Petitioners themselves state "the $55,000 distribution represents the difference between the actual cost of construction and the mortgage loan." In other words, it was dependent upon, followed from, and was paid out of, the funds advanced to the corporation on the F.H.A. mortgage. The mortgage could not have been secured without the existence of the constructed property. Thus as to the cash distribution, not only 70 per cent but all of it was directly attributable to the constructed property. Also as in the Burge case, petitioners rely upon a post-construction motive for the sale of their stock. In this case they depend not upon the current unsuccessful operation of the apartment development but upon their fears for the future *156 due to the proposal to construct a competing project. It is difficult to overlook the coincidence between the sale of the stock, consideration of which began in February or March, and the virtually complete occupancy of all of the apartment units by the end of February, thus creating the greatest saleability for the project prior to realization of current income. There is, moreover, evidence that petitioners knew early in the year about the proposed competing apartment. As in the Burge case, however, we find it unnecessary to resolve this factual issue in view of our conclusion here, as in the Burge case, that by reason of the distribution the corporation conformed to the definition of "collapsible" and that the sale of the stock thereafter, being the sale of stock in a collapsible corporation, is governed by section 117(m). A single factual controversy presents itself here in a form perhaps requiring brief comment. The parties agree that the intention to make the distribution and, therefore, to "avail" of the corporation, as respondent contends, was formed about January 1. The problem posed is whether this occurred "during * * * construction" as called for by respondent's regulations. *157 [3] What is required is that we determine when construction was fully completed. See Edward Weil, 28 T.C. - (decided this day). This controversy has been disposed of in our findings. Petitioners make a vigorous argument that the record demonstrates completion prior to January 1. We have been unable to make such a finding or to conclude that petitioners have sustained their burden of proof to that effect. There is some testimony along those lines and additional evidence leading petitioners to contend that this conclusion is required. But on the record as a whole, including particularly the F.H.A. certificate of inspection and the date of accomplishment of virtually total occupancy, when it seems obvious that petitioners were endeavoring to fill the units and place the corporation in a position to secure "net income" as quickly as they were completed, see Edward Weil, supra, we have made the dispositive finding that construction was not completed until some time after the middle of January. *158 On the authority of Raymond G. Burge, supra. Decisions will be entered for the respondent. Footnotes
1. So stipulated.↩
*. Total costs were stipulated as $1,012,000.00.↩
*. Plus the superintendent and his assistants. ↩
**. Approximate; includes superintendent and assistants.↩
2. "SEC. 117. CAPITAL GAINS AND LOSSES. "(m) Collapsible Corporations. - "* * * "(2) Definitions. - "(A) For the purposes of this subsection, the term 'collapsible corporation' means a corporation formed or availed of principally for the manufacture, construction, or production of property, or for the holding of stock in a corporation so formed or availed of, with a view to - "(i) the sale or exchange of stock by its shareholders (whether in liquidation or otherwise), or a distribution to its shareholders, prior to the realization by the corporation manufacturing, constructing, or producing the property of a substantial part of the net income to be derived from such property, and "(ii) the realization by such shareholders of gain attributable to such property."↩
3. Regulations 111: "Sec. 29.117-11(b). Determination of Collapsible Corporation. - * * * A corporation is formed or availed of with a view to the action described in section 117(m)(2)(A) if the requisite view existed at any time during the * * * construction * * * referred to in that section. * * *"↩